# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JAMES B. HENRY, | ) | CASE NO. 1:12-cv-2374 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | NANCY A. VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | MEMORANDUM OF OPINION |
| | ) | |
| Defendant. | ) | |

This case is before the magistrate judge by consent.  Plaintiff, James B. Henry ("Plaintiff"), challenges the final decision of the Commissioner of Social Security ("Commissioner") denying Henry's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.  Procedural History

On August 10, 2009, Plaintiff filed an application for SSI.  (Tr. 17.)  His application was denied initially and upon reconsideration.  (*Id*.)  Plaintiff timely requested an administrative hearing, and, on June 28, 2011, an administrative law judge ("ALJ"), conducted an administrative hearing.  (*Id*.)  Plaintiff was represented by counsel and testified on his own behalf at the hearing.  (*Id*.)  A vocational expert ("VE") also testified.  (*Id*.)  On July 20, 2011, the ALJ issued a decision in which she determined that Plaintiff is not disabled.  (Tr. 17-38.)  Plaintiff requested a review of the

ALJ's decision by the Appeals Council, and when the Appeals Council declined further review on July 25, 2012, the ALJ's decision became the final decision of the Commissioner.  (Tr. 1.)

On September 21, 2012, Plaintiff filed a complaint challenging the Commissioner's final decision.  (Doc. No. 1)  The parties have completed briefing in this case.  (Doc. Nos. 19, 23, 24.)  Plaintiff alleges that, for various reasons, substantial evidence does not support the ALJ's decision in this case.

## II.  Evidence

### A.    Personal and Vocational Evidence

Plaintiff was born on November 20, 1987 and was 21 years old at the time of his application.  (Tr. 37.)  He completed high school, and had past relevant work as a stock clerk.  (*Id.*)

### B.    Medical Evidence

#### 1.    Plaintiff's Reports to the Agency

In a September 15, 2009 Adult Disability Report, Plaintiff reported that he "severe depression," and "trouble getting along with other people."  (Tr. 200.)  He complained of difficulty concentrating and following directions, as well as "poor reading and writing skills."  (*Id.*)

In a September 21, 2009 Adult Function Report, Plaintiff stated that he lived in an apartment with his girlfriend. (Tr. 209.)  He indicated that, during the day, he watched television, played with his dog, ran errands, relaxed and bathed.  (Tr. 210.)  With the assistance of his girlfriend, he fed and watered his pets, which included a

2

lizard, a turtle, a dog and an unspecified number of cats.  (*Id*.)  Plaintiff reported that he could attend to his personal needs without difficulty.  (Tr. 211.)  Plaintiff reported that he required reminders to brush his teeth and take his medication, and that his girlfriend helped him prepare meals.  (Tr. 211)  He mowed the lawn and cleaned, but indicated that, "I get down [and] don't wanna do it so people have to help me do it."  (Tr. 212.)  Plaintiff stated that he drove a car and grocery shopped, and was able to go out alone.  (*Id*.)  He was able to count change, but could not pay bills, handle a savings account or use a checkbook or money orders.  (Tr. 213.)  He regularly watched television with his family.  (*Id*.)  According to Plaintiff, he could pay attention for five minutes "or more," did not finish what he started, had problems following written instructions because he had "trouble remembering" and could not follow spoken instructions because he had "problem[s] remembering and paying a[ttention]."  (Tr. 214.)

       **2.**       **Plaintiff's Education Records**

Plaintiff's school records reflect that, in April 2002, a Weschler Intelligence Scale for Children, Third Edition ("WISC-III"), revealed that Plaintiff had a verbal IQ of 80, a performance IQ of 102 and a full-scale IQ of 89.  (Tr. 225.)  Plaintiff was the subject of an individualized education plan ("IEP") and, in May 2005, a school psychologist opined that Plaintiff's "behavior significantly hinders his academic functioning," but observed that Plaintiff "appears to continue to show general intelligence within the average range."  (Tr. 225, 226.)  A May 2005 IEP re-evaluation report indicated that Plaintiff "needs to develop social skills to interact appropriately with peers and adults."  (Tr. 218.)  The school psychologist noted that Plaintiff had been diagnosed with attention

3

deficit hyperactivity disorder ("ADHD") and depression, for which he was taking medication.  (Tr. 230.)  The psychologist noted that Plaintiff "often responds negatively when asked to do his work.  He can get very angry and will not cooperate with reasonable teacher/staff requests."  (*Id*.)  The re-evaluation team determined that Plaintiff had "significant emotional/behavioral problems which makes [*sic*] him unable to participate in regular classes and in the general curriculum.  He continues to be a youth with a disability."  (Tr. 232.)

During his twelfth grade year, Plaintiff was home-schooled and received C's in all subjects except Art, in which he received an A.  (Tr. 217, 233.)  In prior years of high school, he had received varied marks, ranging from C's and D's in math and English to B's in science and social studies, and A's in physical education.  (Tr. 233.)

### 3.    Treatments and Examinations

On December 3, 2008, Plaintiff sought assistance at the Center for Individual and Family Services ("CIFS") in Mansfield, Ohio, where he was examined by a social worker.  (Tr. 358.)  He reported feeling chronically depressed and angry, with angry outbursts.  (Tr. 358.)  Plaintiff indicated that he used marijuana – as recently as the day before – and that he drank alcohol.  (Tr. 362.)  Plaintiff grew agitated during the examination because he was "bored."  (Tr. 363.)  The social worker noted that Plaintiff was unable to sit still during the examination.  (Tr. 364.)  The social worker diagnosed Plaintiff with mood disorder, ADHD, cannabis abuse and personality disorder.  (Tr. 367.)  The social worker recommended counseling.  (Tr. 368.)  With respect to Plaintiff's mental status, the social worker noted that his thought processes were logical, his mood was angry and his affect was inappropriate.  (Tr. 370.)

4

On June 22, 2009, psychiatrist Rashad Pervez, M.D., examined Plaintiff.  (Tr. 356-57.)  Dr. Pervez noted that Plaintiff had a history of bipolar disorder and ADHD.  (Tr. 356.)  Plaintiff reported feeling depressed, lack of motivation and appetite, and difficulty sleeping.  (*Id*.)  Plaintiff reported working and having a girlfriend for the prior nine months.  (*Id*.)  Dr. Pervez described Plaintiff as cooperative with decreased psychomotor activity, and characterized his responses to questions as "slow and low in volume" and "coming with pauses."  (Tr. 357.)  Dr. Pervez opined that Plaintiff had fair concentration, memory, insight and judgment.  (*Id*.)  He diagnosed Plaintiff with bipolar disorder and ADHD, and prescribed Depakote, Remeron and Concerta.  (*Id*.)

On October 7, 2009, Dr. Pervez completed a mental functional capacity assessment for the Richland County Department of Jobs and Family Services.  (Tr. 424-25.)  He assigned Plaintiff moderate limitations in the ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple, work-related decisions; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions.  (Tr. 424.)  He concluded that Plaintiff was "not significantly limited" in his ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple

5

instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id*.)

During a November 10, 2009 meeting with the Richland County Bureau of Vocational Rehabilitation ("BVR"), Plaintiff reported that he had gotten along well with his coworkers at his previous job operating a forklift at School Specialty.  (Tr. 539.) During the meeting, Plaintiff "became angry with the [vocational counselor] and mumbled some inappropriate comments including some profane language," and "became agitated, though he kept his actions under control."  (Tr. 540.)

On November 20, 2009, Richard Litwin, Ph.D., examined Plaintiff at the request of the BVR.  (Tr. 444-49.)  He noted that Plaintiff was living with his girlfriend "of the past year."  (Tr. 444.)  The Weschler Adult Intelligence Scale, Third Edition, ("WAISC-III") revealed a verbal IQ of 63, a performance IQ of 68 and a full-scale IQ of 62, which Dr. Litwin characterized as being in the mild mental retardation range.  (Tr. 445.)  Dr. Litwin noted that it was "unclear" why there was such a disparity between those scores and Plaintiff's prior IQ test scores.  (*Id*.)  The Woodcock Johnson Tests of Achievement, Third Edition, ("Woodcock Johnson") revealed that Plaintiff achieved scores placing him at a second-grade level in spelling, word recognition, math, and reading comprehension; a first-grade level in oral comprehension; and below a first-grade level in picture vocabulary, reading rate, reading accuracy and comprehension.  (*Id*.)  Plaintiff demonstrated a severe impairment in the controlled oral word fluency test.  (*Id*.)  Dr. Litwin described Plaintiff as "essentially a non-reader with profound phonological

6

dyslexia," who was able to read or spell only common two or three syllable words.  (*Id.*)

Dr. Litwin noted Plaintiff's complaints of depression, auditory hallucinations and concern that "there is something wrong with his mind."  (Tr. 446-47.)  Plaintiff reported being self-conscious, mistrustful of others and uneasy in crowds.  (Tr. 447.)  Dr. Litwin diagnosed Plaintiff with bipolar disorder, mixed, severe with psychotic features; reading disorder; mathematics disorder; expressive language disorder; and ADHD-combined type, as well as mild mental retardation with depressive personality traits.  (*Id.*)

Dr. Litwin opined that Plaintiff would be unable to make change or work with money in the workplace.  (*Id.*)  He noted that Plaintiff had trouble sustaining attention and retaining information in the future, and would likely demonstrate rapid forgetting and very poor organizational skills.  (Tr. 447-48.)  According to Dr. Litwin, if Plaintiff made "good progress," he would be best suited for "working outdoors or doing very simple, entry-level manual work. [Plaintiff] appears best suited for short term training with extensive job coaching and mentoring.  He will need a rigid daily routine and strong use of organizational strategies to overcome deficits due to ADHA and weakness in memory."  (Tr. 449.)

In April 2010, staff at the Ohio Department of Mental Retardation and Developmental Disabilities ("MRDD") assessed whether Plaintiff was eligible to receive services from that agency.  (Tr. 492-512.)  The evaluator, Angie Mollette, whose credentials are not included in the record, determined that Plaintiff had significant functional limitations in receptive and expressive language, self care, self direction, capacity for independent living, learning and economic self-sufficiency, and, thus was eligible for services through the MRDD.  (Tr. 493.)  Ms. Mollette noted that Plaintiff did

not talk to strangers or initiate conversations, and required reminders to brush his teeth, shave and take his medication.  (Tr. 499-502.)  She noted that Plaintiff initiated activities, such as fishing, with his brother and girlfriend, and was able to maintain meaningful relationships.  (Tr. 502.)  Ms. Mollette indicated that Plaintiff "can independently make decisions," but does not "follow through w[ith] decisions.  He has a short attention span [and] can be easily inpatient [*sic*] or easily distracted."  (Tr. 503.) She noted that Plaintiff took longer than two minutes to read a 103-word passage, opining that he read at "around a first grade level."  (Tr. 508.)  Plaintiff answered all of the questions about the contents of the document incorrectly.  (*Id*.)

On May 5, 2010, Dr. Pervez examined Plaintiff, noting Plaintiff's report that he was living with a girlfriend despite having ended the relationship some weeks prior.  (Tr. 475.)  Plaintiff was lethargic and complained of difficulty sleeping.  (*Id*.)  Plaintiff stated that he went out with his siblings and other people.  (*Id*.)  Dr. Pervez noted that Plaintiff was irritable and arguing with his mother, who attended the examination with Plaintiff. (*Id*.)

On January 14, 2011, Plaintiff a counselor at CIFS noted Plaintiff's report that he had recently left a job interview because he felt anxious.  (Tr. 483.)  On April 21, 2011, Plaintiff reported to a counselor that he was living with his girlfriend, who had children, and that he enjoyed being around her children.  (Tr. 482.)

### 4. Agency Reports

on October 1, 2009, agency consulting psychologist Paul Tangeman, Ph.D., completed a mental residual functional capacity ("RFC") assessment and a psychiatric

8

review technique.  (Tr. 405-08, 409-22.)  Dr. Tangeman opined that Plaintiff was moderately limited in his ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  (Tr. 405-06.)  Dr. Tangeman opined that Plaintiff's allegations were "partially credible," noting that, although Plaintiff reported problems with concentration and attention, he was "completing tasks which require[d] . . . attention span [of] 1-2 hours" and that another psychiatrist had reported that Plaintiff had fair concentration.  (Tr. 408.)  Dr. Tangeman opined that Plaintiff was "capable of simple, repetitive tasks which do not require him to have more than occasional contact with public or to meet strict production quota."  (*Id*.)  In the psychiatric review technique, Dr. Tangeman assigned Plaintiff mild limitations in activities of daily living and maintaining social functioning; and moderate limitations in maintaining concentration, persistence and pace.  (Tr. 419.)

On February 24, 2010, agency consulting psychiatrist David Demuth, M.D., performed a mental RFC assessment and psychiatric review technique.  (Tr. 450-63, 464-67.)  Dr. Demuth assigned Plaintiff moderate limitations in activities of daily living; maintaining social functioning; and maintaining concentration, persistence and pace. (Tr. 460.)  He opined that Plaintiff was moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special

9

supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (Tr. .464-65.)

Dr. Demuth opined that, with respect to understanding and memory, Plaintiff could "do moderately detailed tasks only."  (Tr. 467.)  With respect to sustained concentration and persistence, he concluded that Plaintiff's concentration was "moderately reduced for concentration," that Plaintiff required reduced stress and could "carry out tasks in situations where duties are relatively static and changes can be explained."  (*Id*..)  According to Dr. Demuth, Plaintiff was capable of "tasks that do not require independent prioritization or more th[a]n daily planning."  (*Id*.)  With respect to social interaction, Dr. Demuth opined that Plaintiff "works best in small groups or alone" and could "sustain tasks as long as these involve only occasional and superficial interaction with others.  He cannot work in situations where he needs to resolve conflicts or maintain a friendly and persuasive demeanor."  (*Id*.)  Finally, Dr. Demuth opined that Plaintiff was "dependent and needs structure."  (*Id*.)

**C.** **Hearing Testimony**

**1.** **Plaintiff's Testimony**

At his June 28, 2011 administrative hearing, Plaintiff testified as follows:

He generally lived with his mother and stepfather, although he had lived with two different girlfriends for a few months at a time.  (Tr. 47.)   He had attended special education classes since first grade.  (Tr. 48-49.)  Plaintiff was exempted from taking the proficiency tests required to graduate from high school.  (Tr. 49.)  He had received one-on-one tutoring while in school.  (*Id*.)  Plaintiff did not get along well with other students because he became "agitated very easy" and would "say things I shouldn't say."  (Tr. 50.)

Plaintiff had worked at School Specialties, stocking school products, for two months.  (Tr. 51.)  His older brother, who worked there when he was home from college, helped Plaintiff get a job there.  (*Id*.)  Plaintiff had problems following directions, staying on task and arriving to work on time.  (Tr. 51-52.)  Plaintiff quit his job at School Specialties because he had only one point left in its progressive disciplinary system before he would be fired.  (Tr. 52.)  Thereafter, he drove a service truck for a towing company.  (Tr. 53.)  He worked at that job for two weeks, but was fired for making too many mistakes.  (Tr. 54.)

Plaintiff had problems following directions because he tended to forget what he was supposed to do.  (Tr. 55.)  He had to be reminded to complete tasks like washing the dishes, brushing his teeth or taking out the garbage.  (*Id*.)  Plaintiff had to be reminded to take his medication.  (Tr. 68.)  His mother, stepfather and girlfriend

11

reminded him to do things.  (Tr. 55.)  Plaintiff was easily distracted from tasks by noises or other people.  (*Id*.)  Plaintiff generally got along well with his family, but did not get along with people he did not know.  (Tr. 56.)  He saw his girlfriend a few times each week.  (*Id*.)

Plaintiff watched action movies on television, but generally had problems following the story line.  (Tr. 56.)  He had difficulty staying asleep at night.  (Tr. 56-57.)  Plaintiff did not read for enjoyment.  (Tr. 57.)  He felt that he read at about a fourth or fifth grade level, and could only read small words.  (*Id*.)  He did not read documents sent to him regarding his benefits applications, and "probably wouldn't understand it if I could read it."  (*Id*.)  In response to the ALJ's questions regarding how Plaintiff was able to obtain a driver's license, Plaintiff explained that he took the test on the computer, and read some of the questions with assistance from the staff at the testing location.  (Tr. 57-58.)  The others, he read himself.  (Tr. 58.)

Plaintiff cooked food in the microwave, but burned food when he tried cooking on the stove.  (Tr. 59.)  He needed assistance doing laundry because he could not remember how to operate the machine.  (*Id*..)  He seldom washed dishes because he "didn't get them very clean."  (*Id*.)  He required assistance with grocery shopping, or else he would only buy junk food.  (Tr. 59-60.)

Plaintiff had lived with a previous girlfriend, but they broke up because they argued about "simple stuff" and "just didn't really click."  (Tr. 64-65.)  He dated her for about six to eight months.  (Tr. 66.)  At the time of the hearing, he had been dating his then-current girlfriend for nine months.  (*Id*.)  She had two children; one was seven and

the other was four.  (*Id*.)  Plaintiff got along well with them.  (*Id*.)

Plaintiff played video games on his game console for an hour or two each day.

(Tr. 72-73.)   He could complete the easier levels of the games, but "a lot of times [he]

got frustrated and just quit."  (Tr. 72.)

### 2.    Vocational Expert's Testimony

The ALJ described the following hypothetical individual to the VE:

> Assume that we have a younger individual with a high
> school education and [Plaintiff's past work].  Assume that
> the person has no exertional restrictions but that the person
> would be limited to performing simple, routine, repetitious
> work with one- or two- step instructions; the person would be
> limited to a supervised low-stress environment requiring few
> decisions; and the person would be limited to only
> occasional interaction with the public, coworkers and
> supervisors.

(Tr. 76-77.)  The VE opined that the hypothetical individual could perform Plaintiff's past

relevant work as a stock person, "depending on the situation of the employer."  (Tr. 77.)

The VE also opined that the hypothetical individual could perform work as a janitor

(Dictionary of Occupational Titles ("DOT") no. 323.687-014), an unskilled production

worker (DOT no. 726.687-042), and a hand packer (DOT no. 920.587-018).  (Tr. 78,

81.)

During examination by Plaintiff's counsel, the VE testified regarding how he had

determined that the positions he identified were low stress:

> Generally speaking . . . the simpler a job is, the less
> opportunity there is for complications in the job, the less
> judgment is required, the less stress there is on the job.
> There may be some of those jobs that have production
> requirements in and of themselves that would create stress,
> but generally speaking the lower level the job is in terms of
> skill required, the less stress there on the position,

> particularly in those jobs where it's just a one- or two-step
> position.

(Tr. 85.)  The VE conceded that he could not opine regarding how many of the positions

he identified would have a production demand or quota, but testified that, using a

"standard bell curve," with a normal distribution, "then you're looking at maybe [twelve

and one-half] or so percent of job[s] at the end of the bell curve that would be high

stress."  (Tr. 86.)

Plaintiff's counsel asked the VE whether someone with the limitations described

in Dr. Demuth's mental RFC assessment would be capable of working.  (Tr. 86-87.)

The VE responded that, while one of the limitations by itself would not be sufficient to

preclude work, the cumulative effect of all of the limitations would preclude an individual

from retaining employment for an extended period.  (Tr. 87.)

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Social Security Act when he

establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y*

*of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981)*.  A claimant is considered

disabled when he cannot perform "substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled

by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott*

*v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990)*.  First, the claimant must demonstrate

14

that he is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.  Summary of Commissioner's Decision

In her July 20, 2011 decision, the ALJ made the following findings of fact and conclusions of law:

1.  Plaintiff has not engaged in substantial gainful activity since August 10, 2009, the application date.

2.  Plaintiff has the following severe impairments:  bipolar disorder; learning delays including dyslexia and expressive language, reading and math disorders; cognitive disorder; borderline intellectual functioning; attention deficit hyperactivity disorder; adjustment disorder with disturbance of emotion and conduct; depressive disorder; personality disorder; and

polysubstance abuse including marijuana and alcohol.

3.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.  Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to performing simple, routine repetitious work with 1 or 2 step instructions; limited to a supervised, low-stress environment requiring few decisions; and limited to only occasional interaction with the public, co-workers and supervisors.

5.  Plaintiff is unable to perform any past relevant work.

6.  Plaintiff was born on November 20, 1987 and was 21 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

8.  Plaintiff has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because the claimant's past relevant work is unskilled.

10.  Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.  Plaintiff has not been under a disability, as defined in the Social Security Act, since August 10, 2009, the date the application was filed.

(Tr. at 19-38 (citations omitted).)

## V.  Law and Analysis

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512

(6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Arguments**

Plaintiff argues that, for various reasons, substantial evidence does not support either the ALJ's determination of Plaintiff's RFC or the ALJ's conclusion that Plaintiff was capable of performing work that was available in the national economy.

**1.      Whether the RFC Was Inconsistent On its Face**

Plaintiff argues that the ALJ's finding of Plaintiff's RFC was inconsistent on its face because the RFC requires a supervised environment, but also limits Plaintiff to

only occasional contact with supervisors and coworkers.  According to Plaintiff, a restriction that limits him to only occasional contact precludes him from working under supervision.

This argument lacks merit.  In describing the hypothetical individual whose restrictions the ALJ ultimately adopted as Plaintiff's RFC, the ALJ included both restrictions at issue here.  In response, the VE identified several positions that satisfied both restrictions, and gave no indication that the two were contradictory or otherwise irreconcilable.  Clearly, the VE found no contradiction in characterizing a position as supervised when that position includes only occasional contact with supervisors.  Moreover, although the two limitations at issue could be considered contradictory, such a finding is not required as the two limitations also can be reconciled.  The limitation to occasional interaction does not entirely preclude contact with supervisors.  Rather, "'occasionally'" means occurring from very little up to one-third of the time."  S.S.R. 83-10, 1983 WL 31251, *5 (S.S.A. 1983).  Given this, the VE could have determined that a position qualifies as supervised where a worker spends up to one-third of the workday in contact with his supervisor.  Plaintiff points to nothing in the record suggesting that the VE's opinion or testimony on this issue was unfounded or otherwise inaccurate.  Accordingly, substantial evidence supports the ALJ's determination on this point.[1]

_____

[1]     Plaintiff notes that, in testing performed by Dr. Litwin, Plaintiff demonstrated "severe inattention on the Digit Vigilance Test" (tr. 446), and argues that "[a] person with severe inattention is likely to need special supervision as indicated by Dr. Demuth."  (Plaintiff's Brief ("Pl. Br.") at 14.)  This conclusory assertion, unsupported by medical opinion in the record, is not sufficient to demonstrate that ALJ erred in this context.

**2.      Whether the RFC Account for Plaintiff's Reading and Math Disorders**

The ALJ determined that Plaintiff's severe impairments included reading and math disorders.  (Tr. 19.)  Plaintiff argues that the ALJ failed to account for these disorders in determining Plaintiff's RFC.  The Commissioner contends the opposite, specifically arguing that the restriction to "simple, routine, repetitive work with 1 or 2 step instructions" adequately accounted for Plaintiff's reading and math disorders.

Plaintiff's argument is not well taken.  Although the ALJ's restrictions did not explicitly address Plaintiff's reading and math abilities, the RFC restricted Plaintiff to simple, routine, repetitive work that involved only one or two steps.  (Tr. 25.)  Other than asserting the conclusion that the RFC was insufficient to address these limitations, Plaintiff does not explain how the non-exertional restrictions failed to address Plaintiff's reading and math disorders.  Absent further explanation, this argument lacks merit.

Plaintiff contends that the Commissioner's argument constitutes improper post-hoc rationalization for the ALJ's decision.  This is not correct.  This is not a situation where the ALJ cited to one set of limitations as the basis for including the non-exertional restrictions and the Commissioner asserts that those restrictions address additional limitations.  Rather, the ALJ recognized that Plaintiff had reading and math disorders and, thus, it is reasonable to conclude that he intended that the non-exertional limitations address those disorders.  Accordingly, the Commissioner's argument is not improper post-hoc rationalization.

**3.      Strict Production Quotas**

In his decision, the ALJ acknowledged Dr. Tangeman's opinion that Plaintiff

should be restricted to working in jobs without strict production quotas.  (Tr. 31.)

However, he did not include that specific restriction in Plaintiff's RFC, opining that other

restrictions addressed Plaintiff's limitation in this area:

> Notably, while the undersigned did not specifically prohibit
> strict quotas in the [RFC], [the VE] testified that most jobs
> described in [the RFC] would not result in stress.  Thus, the
> undersigned concluded that the [RFC] generally, but not
> verbatim, accounted for [Plaintiff's] need to avoid strict
> quotas.

(*Id*.)

Plaintiff argues that substantial evidence does not support the ALJ's reasons for

omitting Dr. Tangeman's prohibition against strict production quotas in Plaintiff's RFC

because the VE's testimony on this issue was not reliable.  The Commissioner

responds that such a restriction was not necessary because the VE identified simple,

routine jobs, the majority of which – according to the VE – did not have production

quotas.

Plaintiff's argument is not well taken.  While the ALJ's hypothetical could have

been improved, it is not a material error.  The ALJ asked the VE to assume "low stress

jobs" and assumed this would account for Plaintiff's need to avoid strict production

quotas.  This Court agrees – as the point of "no production quotas" is to avoid the

stress of jobs with a required pace. In fact, in many ways, the limitation of a "low stress"

job is a broader category of jobs than those with no production quotas.

Moreover, the testimony, taken as a whole and in context, does not support

Plaintiff's allegations that the VE did not know whether most of the jobs involved

production quotas.  The VE clearly testified that simple jobs generally do not have

production quotas or stresses.  It is immaterial that the VE could not identify a specific number of jobs that may deviate from that general principle.

### 4.     The ALJ's Assessment of Medical Opinion Evidence

Plaintiff contends that the ALJ erred in various ways in assessing the opinions of state agency consultants Drs. Tangeman and Demuth, and treating physician Dr. Pervez.

### A.     Opinion that Plaintiff Was Capable of Work

In her decision, the ALJ granted "significant weight . . . to [the] opinions of state examiners, Dr. Tangeman and Dr. Demuth, both of whom found [Plaintiff] capable of work." (Tr. 34.)  Plaintiff contends that neither state consultant opined that Plaintiff was capable of working, but, rather, assigned him restrictions that, according to the VE, would preclude work.  Plaintiff asserts that this is an error that requires remand.

This argument lacks merit.  As a preliminary matter, the ALJ's assessment of the opinions of Drs. Tangeman and Demuth is not erroneous.  Rather, Dr. Tangeman opined that Plaintiff was "capable of simple, repetitive tasks that do not require him to have more than occasional contact with [the] public or meet strict production quota[s]." (Tr. 408.)  Dr. Demuth opined that Plaintiff was capable of performing tasks that were moderately detailed, with static duties and that did not require independent prioritization or more than daily planning.  (Tr. 467.)  Although neither consultant used the phrase "capable of work" to describe Plaintiff, each consultant described tasks that Plaintiff would be capable of performing.  Although the ALJ may have broadly characterized their opinions, this characterization is not so inaccurate as to constitute error.

21

Further, Plaintiff fails to explain how, if the ALJ did err in describing the consultants' opinions, that error prejudiced him.  The record does not support any such claim, particularly as the ALJ did not depend on her characterization of the state consultants' opinions to avoid her obligation to determine the ultimate issue of whether Plaintiff was disabled.  Rather, the ALJ discussed their opinions, along with other evidence in the record, as evidence on which she had relied in determining that issue, and included in the RFC restrictions that addressed the limitations assigned by the consultants.

### B.    Circular Reasoning

In her decision, in assigning significant weight to the opinions of Drs. Tangeman and Demuth, the ALJ noted that their opinions were "supportive of the [RFC] above and of the finding below of not disabled, and thus afforded significant weight."  (Tr. 35.) Plaintiff contends that the ALJ erred in assigning significant weight to medical opinions because they supported her conclusion regarding the RFC and the ultimate disposition fo the case.  Plaintiff argues that the ALJ relied on circular reasoning by determining the weight to afford a particular opinion based on the extent to which it was consistent with her conclusions.

Had the ALJ concluded her analysis of the state consultants' opinions with the statement highlighted by Plaintiff, this argument might have some merit.  However, Plaintiff again singles out and challenges one isolated phrase of the ALJ's opinion without addressing the context of the ALJ's entire analysis of the issue.  After assigning significant weight to the opinions in the sentence at issue here, the ALJ continued:

> Both opinions were well supported by the evidence,

22

> including [Plaintiff's] admission that he had friends and that
> he could perform his activities of daily living.  In addition,
> [Plaintiff] testified that he had a girlfriend and got along well
> with his girlfriend's children. Moreover, [Plaintiff's]
> psychiatrist's assessment generally supported moderate
> deficits consistent with [the RFC] held above and with the
> state examiners' conclusions.  In sume, these opinions were
> consistent with the record as a whole and well-supported by
> the medical evidence, and thus afforded significant weight.

(Tr. 35.)  Accordingly, although, when considered in isolation, the ALJ's statement could

suggest circular reasoning, a review of the ALJ's entire discussion of this issue reveals

that she did not assign weight to these opinions based on the extent to which they were

consistent with her conclusions.  This argument lacks merit.

### C.  Evidence in Support of the Medical Opinions

Next, Plaintiff contends that the ALJ mischaracterized some of the evidence she

cited to support her assessment of the consultants' opinions.  Specifically, Plaintiff

asserts that: (1) Exhibit 3E, to which the ALJ cited in support of her statement that

Plaintiff had friends, demonstrated only that Plaintiff lived his girlfriend; (2) Plaintiff did

not ever testify that he had friends; (3) Plaintiff had broken up with one girlfriend after

six to eight months because they didn't get along and argued about chores, and, at the

time of his hearing, had been dating his then-current girlfriend for nine months; and

(4) there was evidence in the record that Plaintiff required reminders to perform chores

and brush his teeth, burned food when he tried to cook more than simple meals,

required assistance with shopping in order to avoid buying junk food, did not get along

well with others, was easily distracted, and had never paid bills or handled a bank

account.

With respect to his first three arguments, Plaintiff fails to explain how, to the

extent the ALJ erred in assessing the evidence, these errors caused him prejudice.

Although the evidence cited by the ALJ does not explicitly support her statement that

Henry had friends other than his girlfriend, Plaintiff does not explain how his RFC would

have been different had the ALJ properly described the evidence, particularly in light of

the fact that the ALJ limited Plaintiff to occasional interaction with others.  Similarly,

Plaintiff does not explain how his dating and relationship history was significant with

respect to this RFC.  Accordingly, these arguments clearly lack merit.

There is also no merit to Plaintiff's argument that the ALJ ignored evidence that

Plaintiff was limited in performing certain activities of daily living, such as chores and

shopping.  The ALJ discussed the evidence regarding this issue as follows:

> In terms of his activities of daily living, [Plaintiff's] reports suggested little limitation.  Specifically, [Plaintiff] testified that he prepared simple meals, helped with the dishes, took out the trash and took his medications, both with reminders, managed his personal care needs, shopped with some assistance and drove a vehicle independently. [Plainitff] then asserted that he was unsure of how to do laundry, forgot to brush his teeth and had poor eating habits.  Still, [Plaintiff] testified that he watched TV, played with the dog and ran errands.  In addition, [Plaintiff] reported that he played video games, spending hours at the Playstation each day.  The record further noted that [Plaintiff] helped care for his pets.  Moreover, while [Plaintiff] testified that he lived with his parents currently, he admitted that he had lived with a previous girlfriend for many months.  Overall, while the undersigned recognized that [Plaintiff] needed reminders to perform certain tasks and alleged being unable to do his own laundry, [Plaintiff's] overall reports suggested mainly intact and broad activities of daily living with very little limitation.  Thus, only a mild limitation was afforded in this domain, consistent with the finding of one state examiner.

(Tr. 26.)  Although Plaintiff's description of his daily activities may contain slightly

greater restrictions than those imposed by the ALJ in her determination of Plaintiff's

24

RFC, Plaintiff does not explain how these differences require additional or more

substantial limitations in his RFC.

### D.    Opinion of Dr. Pervez

In her decision, the ALJ afforded "some weight" to the opinion of Dr. Pervez,

noting that it was not entirely consistent with the record:

> Some weight was afforded to the opinion of treating
> psychiatrist Dr. Pervez.  Dr. Pervez noted mainly moderate
> limitations in multiple areas, including the ability to: maintain
> attention and concentration for extended periods, to sustain
> an ordinary routine without special supervision, to work in
> coordination or proximity to other[s] without being distracted,
> to make simple work-related decisions, to accept instructions
> and respond appropriately to criticism from supervisors, to
> get along with coworkers or peers without distracting them,
> to respond appropriately to change and be aware of normal
> hazards and to take precautions.  While the undersigned
> generally concurred that [Plaintiff] had moderate deficits in
> concentration, persistence or pace and social functioning,
> the two areas covered in the limitations above, the record
> did not support all of the above deficits.  Specifically,
> [Plaintiff ] testified that he played video games for hours
> daily, evidence of an ability to maintain attention and
> concentration for extended periods.
>
> In addition, the record lacked credible support for the
> conclusion that [Plaintiff] required special supervision.
> Rather, [Plaintiff] was able to drive a car independently, mow
> the lawn and manage many other activities of daily living.
> [Plaintiff] had also been able to live independently with his
> girlfriend until they broke up, further suggestive of an ability
> to function on his own.  The undersigned concluded that
> while [Plaintiff] required supervision given his noted deficits,
> a restriction requiring special supervision was simply
> unmerited.  Moreover, [Plaintiff] was noted within the record
> to be able to make decisions, thus discrediting Dr. Pervez's
> conclusion that [Plaintiff] would be moderately unable to
> make simple work-related decisions.  Furthermore, [Plaintiff]
> reported that he had gotten along with his past co-workers.
> Notably, Dr. Pervez found no significant limitations in
> [Plaintiff's] ability to maintain attendance and punctuality,

25

> contrary to his testimony.  Overall, Dr. Pervez's assessment
> was afforded some weight as it generally supported
> moderate deficits in social functioning and concentration,
> persistence or pace.  Yet, as all conclusions were not fully
> supported as discussed above, only some weight was
> merited.

(Tr. 36.)

There is no dispute that Dr. Pervez was Plaintiff's treating psychiatrist.  An ALJ must give the opinion of a treating source controlling weight if she finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).

Here, Plaintiff argues that substantial evidence does not support the ALJ's reasons for rejecting portions of Dr. Pervez's opinion, for four reasons.  First, Plaintiff asserts that the ALJ exaggerated the significance of Plaintiff's testimony that he played video games.  Specifically, Plaintiff notes that he testified that he played for one or two hours each day, and usually became frustrated and quit.  (Tr. 72-73.)  He also notes

26

that, although Drs. Tangeman and Demuth also assigned Plaintiff moderate limitations in maintaining attention and concentration (tr. 405-06, 464-65), the ALJ did not explicitly reject this element of their opinions.  To the extent that the ALJ may have overstated the meaning of Plaintiff's testimony regarding video games, Plaintiff again fails to explain how that error caused him prejudice.  Although the ALJ did not entirely accept Dr. Pervez's opinion regarding Plaintiff's limitations in this context, she included restrictions in Plaintiff's RFC that addressed his limited ability to maintain attention and concentration.  Specifically, the ALJ limited Plaintiff to simple, routine, repetitious work involving one or two-step instructions.  Plaintiff does not explain how, if the ALJ had accepted Dr. Pervez's opinion regarding his limitations in this context, Plaintiff's RFC would have changed.

Second,  Plaintiff argues that the record does not support the ALJ's reasons for rejecting Dr. Pervez's opinion that Plaintiff required special supervision.  Specifically, Plaintiff points to evidence that Plaintiff lived with a girlfriend, and required assistance with shopping, mowing, handling his finances, taking his medication and completing chores.  This argument lacks merit, as the ALJ's characterization of the evidence was not unreasonable.  Evidence in the record revealed that, although he required reminders and assistance with some tasks – such as taking his medication and shopping – he was also able to complete other tasks without assistance – such as his personal care, driving, cleaning and mowing the lawn.  (Tr. 210-11, 212.)  Further, although there was evidence in the record that his girlfriend reminded him to perform, or assisted him with, some tasks – such as brushing his teeth, feeding their pets and preparing meals – there is no evidence in the record that her assistance rose to the

level of "special supervision."  Indeed, the ALJ could – and did –  reasonably construe the evidence that Plaintiff was able to maintain a live-in relationship with someone other than family as supporting her conclusion that Plaintiff did not require special supervision.  Accordingly, this argument lacks merit.

Plaintiff's third basis for challenging this portion of the ALJ's decision arises out of the ALJ's rejection of Dr. Pervez's opinion that Plaintiff "would be moderately unable to make simple work-related decisions."  (Tr. 36.)  In rejecting this portion of Dr. Pervez's opinion the ALJ cited to evidence that Plaintiff "was able to make decisions." (*Id*.)  Plaintiff argues that the ALJ failed to consider all of the relevant evidence regarding this issue.  Specifically, Plaintiff notes that, in making this observation, the ALJ was likely referring to the MRDD evaluator's statement that Plaintiff was able to "independently make decisions."  (Tr. 503.)  Plaintiff points out that the remainder of the evaluation reflected the evaluator's opinion that, although Plaintiff was capable of making decisions, he generally failed to follow through with them, was easily distracted and did not learn from past mistakes.  (*Id*.)  Although Plaintiff accurately characterizes the entirety of the MRDD evaluation on this point, he once again fails to explain how he was prejudiced by any error by the ALJ.  Plaintiff does not describe how the RFC in this case would have changed had the ALJ accepted Dr. Pervez's opinion that Plaintiff was moderately limited in his ability to make simple work-related decisions.  Plaintiff does not explain how the limitation to simple, routine, repetitious work with one or two-step instructions fails to address this limitation.  Nor does he describe what additional or different restrictions the ALJ would have included in the RFC had she accepted this

28

portion of Dr. Pervez's opinion.  Accordingly, this argument is not well taken.[2]

Plaintiff's fourth argument on this issue arises out of the ALJ's observation that Plaintiff "reported that he had gotten along with his past co-workers." (Tr. 36.)  Plaintiff contends that the significance of this observation is unclear, and asserts that it reflects that the ALJ was inconsistent in her criticism of the medical opinions in this case.  A review of the record reveals that, in making this observation, the ALJ was likely rejecting – or at least questioning – Dr. Pervez's opinion that Plaintiff would have moderate difficulties getting along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 424.)  As with several of his other arguments in this context, Plaintiff fails to explain how, if the ALJ erred in relying on Plaintiff's own statement regarding his ability to get along with co-workers (tr. 539), this error caused him prejudice, particularly in light of the ALJ's decision to restrict him to occasional interaction with the public, coworkers and supervisors (tr. 25).  Accordingly, this argument lacks merit.

### E.    Opinion of Dr. Demuth

In her decision, the ALJ noted that, during questioning by Plaintiff's counsel, the VE opined that an individual with all of the limitations assigned in Dr. Demuth's mental RFC assessment would be unable to work.  (Tr. 32-33, 87.)  However, the ALJ determined that not all of Dr. Demuth's conclusions were supported by the record:

_____

[2]    Plaintiff also asserts that, because the findings of the MRDD evaluation contradicted the ALJ's determination of Plaintiff's RFC, the ALJ was required to explain her decision not to adopt those findings.  However, in her decision, the ALJ afforded the MRDD report "some weight" and detailed multiple ways in which some of those conclusions contradicted other evidence in the record.  (Tr. 33-34.)

> Yet, the undersigned observed that, like Dr. Pervez's earlier conclusions, only some of the above restrictions had support within the record.  Notably, Dr. Pervez, [Plaintiff's] treating psychiatrist, had found no significant deficits in [Plaintiff's] ability to complete a normal workday or workweek or to interact with the public. . . .  Furthermore, also as discussed above, the record failed to establish a need for "special" supervision.  Thus, while Dr. Demuth's opinion and corresponding Psychiatric Review Technique Analysis (PR) were generally consistent with the [RFC] and a finding of not disabled, they were not accepted in totality.  Thus, given that some of Dr. Demuth's conclusions lacked support or were simply contradicted by other sources, this opinion was afforded only some weight.  Moreover, the conclusion of [the VE] was not applicable, as the record did not establish moderate deficits in all of the areas posed in the question by counsel.

(Tr. 33.)

Where, as here, the ALJ declines to give controlling weight to a treating physician's opinion, the relevant regulation requires the ALJ to "explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us."  20 C.F.R. § 404.1527(e)(2)(ii).  Plaintiff contends that substantial evidence does not support the ALJ's reasons for rejecting Dr. Demuth's opinion that Plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.  Specifically, Plaintiff points to evidence in the record that Plaintiff left a job interview because he grew anxious, finished high school at home due to behavior problems, and grew agitated during an interview with the BRV.

Although Plaintiff points to evidence in the record that supports Dr. Demuth's

opinion that Plaintiff was moderately limited in his ability to complete a normal workday and workweek, substantial evidence also supports the ALJ's decision to reject that opinion on this point.  *See* .  *Ealy*, 594 F.3d at 512 ("If the Commissioner's decision id based upon substantial evidence, we must affirm, even if substantial evidence exists in the record supporting a different conclusion.")  Specifically, as noted by the ALJ, Dr. Pervez opined that Plaintiff was not significantly limited in that area, or in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  (Tr. 424.)

Plaintiff argues that the ALJ erred in relying on Dr. Pervez's opinion to discredit Dr. Demuth's opinion because she had previously discredited several aspects of Dr. Pervez's opinion.  This argument lacks merit, as there is no legal authority requiring an ALJ to reject or accept every facet of a medical source's opinion merely because she accepts or rejects one element of that opinion.  Rather, an ALJ must base her determination of a claimant's RFC "upon consideration of all relevant evidence in the case record."  S.S.R. 96-5p, Policy Interpretation, 1996 WL 374183 at *5 (S.S.A.). Here, the ALJ identified reasons for rejecting certain portions of Dr. Pervez's opinion, and for accepting others. Nothing precluded her from relying on those portions of Dr. Pervez's opinions that she had not rejected to explain her decision not to adopt portions of Dr. Demuth's opinion.

### F.    Dr. Tangeman's Opinion

In her decision, the ALJ assigned "significant weight" to Dr. Tangeman's opinion, noting that it was "well supported by [Plaintiff's] intact and broad range of activities of daily living."  (Tr. 31.)  Plaintiff argues that the ALJ erred in assigning this weight to Dr.

31

Tangeman's conclusions, and points to evidence in the record that Plaintiff required assistance with activities such as cooking, shopping, laundry and mowing the lawn, and that he required reminders to brush his teeth and take his medications. Plaintiff also contends that "Dr. Tangeman had less information available to him than Dr. Demuth," because Dr. Demuth "had the benefit of Dr. Pervez's opinion as the treating psychiatrist." (Pl. Br. at 15.)

Plaintiff's arguments lack merit. In finding that Plaintiff was capable of a "broad range" of activities of daily living, the ALJ pointed to evidence that Plaintiff prepared simple meals, helped with household chores, managed his personal needs, drove a vehicle, played with his pets, ran errands, and lived with a girlfriend. (Tr. 26.) The ALJ concluded that, although Plaintiff "needed reminders to perform certain tasks and alleged being unable to do his own laundry," the evidence "suggested mainly intact and broad activities of daily living with very little limitation." (*Id*.) The bases for the ALJ's conclusion in this regard are evident in the record and, thus, substantial evidence supports the ALJ's decision to assign significant weight to Dr. Tangeman's opinion on this issue. Accordingly, Plaintiff is not entitled to remand on the basis of the ALJ's assessment of the medical source opinions in the record.

### 5.    Reasoning Level of the Jobs Identified by the VE

In response to the VE's hypothetical limiting the hypothetical individual to, *inter alias*, jobs consisting of one or two-step instructions, the VE identified the positions of janitor (DOT 323.687-014), production worker (DOT 726.687-042), and hand packer (DOT 920.587-018). (Tr. 77.) Plaintiff contends that the ALJ erred in relying on these

occupations to determine that he was not disabled because the reasoning level of two of the occupations – production worker and hand packer – exceed the reasoning level permitted by the hypothetical.

In addition to listing the duties of numerous occupations, the DOT also describes various characteristics of each occupation.  Included in these characteristics is the General Educational Development level ("GED"), which "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance."  *See* DOT, Appendix C, available at www.oalj.dol.gov/public/dot/references/dotappc.htm (last visited Sept. 10, 2013).  An occupation's GED level consists of three measures: reasoning development; mathematical development; and language development.  *Id*.

Here, Plaintiff's sole argument is that the reasoning development level for the production worker and hand packer positions exceeds the level permitted by the hypothetical.  Plaintiff notes that the restriction to one and two-step instructions limited the hypothetical individual to occupations with a level 1 reasoning level.  The DOT describes a level 1 reasoning level as follows:

> Apply commonsense understanding to carry out one- or -two
> step instructions.  Deal with standardized situations with
> occasional or no variables in or from these situations
> encountered on the job.

DOT, Appendix C, available at www.oalj.dol.gov/public/dot/references/dotappc.htm (last visited Sept. 10, 2013).  The DOT assigns the production worker and hand packer occupations a level 2 reasoning level, *see* DOT 726.687-042 and 920.587-018, which is defined as:

> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.

*See* Dictionary of Occupational Titles, Appendix C, available at

www.oalj.dol.gov/public/dot/references/dotappc.htm (last visited Sept. 10, 2013).

Plaintiff is arguably correct in asserting that, given the restriction to one or two-step instructions in the ALJ's hypothetical, the VE's testimony that such an individual could perform work as a production worker or hand packer was not consistent with the DOT.

However, to the extent that the VE erred in identifying the hand packer and production worker occupations, the error does not require remand in this case.  In response to the ALJ's hypothetical, the VE identified a third position – janitor (DOT 323.687-014) – which has a reasoning level of 1.  DOT 323.687-014.  The VE testified that "[t]here would be about 14,000 of these positions in Ohio and about 360,000 nationwide."  (Tr. 77.)  Plaintiff does not dispute that the janitor occupation comports with the requirements of the hypothetical.  Rather, Plaintiff contends that the VE's testimony about the occupation does not substantially support the ALJ's decision on disability because the ALJ failed to make a separate finding that the janitor occupation – by itself –  existed in significant numbers in the national economy.  Further, he argues – without reference to any legal authority – that the issue of whether there are a significant number of positions in the national economy is for the ALJ, rather than this Court.

Plaintiff's argument lacks merit.  In her decision, the ALJ recited the number of available positions for each occupation identified by the VE. (Tr. 38.)  She then

34

determined that, based on, *inter alias*, his RFC, Plaintiff was capable of performing "work that exists in significant numbers in the national economy." (*Id.*)  She did not indicate that her conclusion regarding whether there were a sufficient number of positions was contingent upon adding together the number of positions of each occupation identified by the VE.  Nothing in the decision suggests that to be the case.  Further, Plaintiff points to no legal authority precluding this Court from determining whether substantial evidence supports the ALJ's conclusion on this point.  Indeed, this Court frequently addresses this issue, and has concluded that occupations with fewer positions than the janitor position – 14,00 positions in Ohio and 360,00 nationally – existed in significant numbers in the national economy.  *See, e.g., Williamson v. Comm'r of Soc. Sec.*, 55 F. App'x 287, 288 (6th Cir. 2003) (8,600 jobs constituted a significant number); *Lewis v. Sec'y of Health & Human Servs.*, 51 F.3d 272 (6th Cir. 1995) (unpublished opinion) (finding that 14,000 jobs constitute a significant number of jobs in the economy); *Girt v. Astrue*, No. 5:09-cv-1218, 2010 WL 908663, at *4 (N.D. Ohio Mar. 12, 2010) (finding that 600 jobs state-wide and 35, 000 jobs nationally constituted significant number of jobs).  Accordingly, although substantial evidence does not support the conclusion that Plaintiff was capable of working as a production worker or hand packer, substantial evidence does support the ALJ's conclusion that Plaintiff was capable of working as a janitor, and that the janitor occupation existed in significant numbers in the national economy.

Plaintiff contends that this Court should not rely on any portion of the VE's testimony regarding the relevant occupations because the ALJ failed to ask the VE

whether his testimony was consistent with the DOT.  Social Security Ruling 00-4p requires an ALJ to "inquire, on the record," whether the VE's testimony was consistent with the DOT.  S.S.R. 00-4p, 2000 WL 1898704, *2 (Dec. 4, 2000); *see Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 603 (6th Cir. 2009) ("[T]he Social Security Administration has imposed an affirmative duty on ALJs to ask the VE if evidence that he or she has provided conflicts with the information provided in the DOT.") (internal quotation marks and alteration omitted).  Plaintiff notes, correctly, that the ALJ failed to inquire whether the VE's testimony was consistent with the DOT, and argues that, accordingly, the VE's testimony was not reliable.

Plaintiff's argument lacks merit.  Rather than treat an ALJ's failure to make the required inquiry as *per se* reversible error, "courts in this circuit have generally concluded that the ALJ's failure to inquire about consistency with the DOT is not reversible error unless a potential conflict actually exists, thereby undermining the reliability of the VE's testimony and the ALJ's ability to rely upon it."  *Goulette v. Comm'r of Soc. Sec.*, No. 12-11353, 2013 WL 2371695, *11 (E.D Mich. May 30, 2013); *see also Miller v. Comm'r of Soc. Sec.*, No. 4:10-cv-2852, 2012 WL 398650, * 15 (N.D. Ohio Feb. 7, 2012) (Knepp, M.J.) ("Though the Sixth Circuit has not definitely resolved the issue, courts within this circuit tend to hold that the technical error of failing to inquire does not constitute reversible error.")  Here, although Plaintiff has identified a conflict between the DOT and the VE's testimony regarding the hypothetical individual's ability to perform the work of a production worker and a hand packer, he has not identified any inconsistency between the VE's testimony that the hypothetical individual described by

36

the ALJ could work as a janitor and the DOT listing for that occupation.  Accordingly, in this case, the ALJ's failure to inquire as required by S.S.R. 00-4p does not constitute reversible error, and Plaintiff is not entitled to remand on this basis.

### 6.    Plaintiff's Education Level

In her decision, the ALJ determined that Plaintiff had "at least a high school education."  (Tr. 37.)  Plaintiff contends that substantial evidence does not support this conclusion.  Specifically, Plaintiff points to educational and other records in evidence that, although he completed high school, he did not obtain the same level of ability as other high school graduates.

The relevant regulations provide that, although the grade level a claimant achieved is relevant, it is not necessarily dispositive of the issue of that individual's education abilities:

> [T]he numerical grade level that you completed in school may not represent your actual educational abilities.  These may be higher or lower.  However, if there is no evidence to contradict it, we will use your numerical grade level to determine your educational abilities.

20 C.F.R. § 404.1564(B).  Plaintiff points to the fact that he completed high school at home – as well as to more recent testing demonstrating that his language and mathematics skills were at or below the second grade level – to argue that the ALJ erred in concluding that he had a high school education, and, thus, that he is entitled to remand.

Although there is evidence in the record that arguably supports his contention that his educational abilities do not correspond with those of a high school graduate, Plaintiff's argument lacks merit.  The relevant regulation assumes that an individual who

37

has completed high school "can do semi-skilled through skilled work." 20 C.F.R. § 404.1564(b)(4).  In this case, the janitor occupation identified by the VE has a specific vocational profile ("SVP") of 2, *see* DICOT 323.687-014, which corresponds to unskilled work, *see* S.S.R. 00-4p, 2000 WL 1898704 at *3.  Accordingly, although the ALJ may have assumed an educational level that exceeded Plaintiff's abilities, she concluded that he was capable of performing work that fell below the skill level attributed to high school graduates.  Plaintiff fails to explain how – particularly in light of the occupation identified by the ALJ –  the ALJ's conclusion on this issue caused him prejudice.  He is not entitled to remand on this basis.[3]

### VI.  Conclusion

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: September 23, 2013

---

[3]     The Court notes that many of Plaintiff's arguments, while arguably accurate in pointing to technical or other errors in the ALJ's decision, failed to explain how those errors actually prejudiced the outcome of his case.  Counsel is reminded of the necessity of demonstrating that an error caused harm in order to prevail on review.  A remand is not predicated upon the number of errors raised; rather it is based upon errors that are material and significant that affect the outcome of the case and the reliability of the ALJ's decision.  It is counsel's obligation to fully brief the errors presented to the Court, as this Court can deem waived those issues that are raised in only a perfunctory manner.  *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir.1997)).